5

FILED
IN CLERK'S OFFICE

2004 AUG -2 P 12: 33

U.S. DISTRICT COURT
DISTRICT OF MASS.

1      defendant must have gone into the building and

2      that's why he was not found in possession of the

3      controlled buy money.  My only point on that is

4      that Officer Lozada, according to the testimony,

5      went south on Terrance Street at a vantage point

6      that would have given him a view of the back side

7      of the building.  And they didn't call him.  And

8      that's all I have to say.

9                   THE COURT:  Okay.  Fine.  I decline to

10     give the missing witness instruction.

11     [End of conference.]

12                  THE COURT:  Mr. Brown, for the record.

13                  MR. BROWN:  Your Honor, at this point

14     the defendant rests.

15                  THE COURT:  All right.  Thank you.  The

16     prior action on the motion is taken again.

17                  All right, Mr. Eason?

18                  THE CLERK:  Yes, your Honor.

19                  THE COURT:  Thank you very much.

20                  Anything, first, on rebuttal?

21                  MR. MORSE:  Nothing, your Honor.

22                  THE COURT:  All right.  Thank you.

23                  What I didn't do when I walked in and I

24     will do now is to double-check with you to make

[488 US 445]
FLORIDA, Petitioner

v

MICHAEL A. RILEY

488 US 445, 102 L Ed 2d 835, 109 S Ct 693, reh den (US) L Ed 2d 172, 109 S Ct 1659

[No. 87-764]

Argued October 3, 1988. Decided January 23, 1989.

**Search and Seizure § 2 —— what constitutes search —— public exposure**

2a, 2b. What a person knowingly exposes to the public is not a subject of protection under the search and seizure provisions of the Federal Constitution's Fourth Amendment. [Per White, J., Rehnquist, Ch. J., Scalia, Kennedy, and Stevens, JJ.]

---

[3c] In determining whether Riley had a reasonable expectation of privacy from aerial observation, the relevant inquiry after Ciraolo is not whether the helicopter was where it had a right to be under FAA regulations. Rather, consistent with Katz, we must ask whether the helicopter was in the public airways at an altitude at which members of the public travel with sufficient regularity that Riley's expectation of privacy from aerial observation was not "one that society is prepared to recognize as 'reasonable.'" Katz, supra, at 361, 19 L Ed 2d 576, 88 S Ct 507. Thus, in determining "' whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment,'" Ciraolo, supra, at 212, 90 L Ed 2d 210, 106 S Ct 1809 (quoting Oliver, supra, at 182 183, 80 L Ed 2d 214, 104 S Ct 1735), it is not conclusive to observe,

[488 US 455]
as the plurality does, that "[a]ny member of the public could legally have been flying over Riley's property in a helicopter at the altitude of 400 feet and could have ob-

(1)

served Riley's greenhouse." Ante, at 451, 102 L Ed 2d, at 842. Nor is it conclusive that police helicopters may often fly at 400 feet. If the public rarely, if ever, travels overhead at such altitudes, the observation cannot be said to be from a vantage point generally used by the public and Riley cannot be said to have "knowingly expose[d]" his greenhouse to public view. However, if the public can generally be expected to travel over residential backyards at an altitude of 400 feet, Riley cannot reasonably expect his curtilage to be free from such aerial observation.

In my view, the defendant must bear the burden of proving that his expectation of privacy was a reasonable one, and thus that a "search" within the meaning of the Fourth Amendment even took place. Cf. Jones v United States, 362 US 257, 261, 4 L Ed 2d 697, 80 S Ct 725, 78 ALR2d 233 (1960) "Ordinarily, then, it is entirely proper to require of one who seeks to challenge the legality of a search as the basis for suppressing relevant evidence that he allege, and if the allegation be disputed that he establish, that he himself was the victim of an invasion of privacy"); Nardone v United States, 308 US 338, 341, 84 L Ed 307, 60 S Ct 266 (1939)

---

[2b] I agree, of course, that "[w]hat a person knowingly exposes to the public ... is not a subject of Fourth Amendment protection." Katz, supra, at 351, 19 L Ed 2d 576, 88 S Ct 507. But I cannot agree that one "knowingly exposes [an area] to the public" solely because o helicopter may legally fly above it. Under the plurality's exceedingly grudging Fourth Amendment theory, the expectation of privacy is defeated if a single number of the public could conceivably position herself to see into the area in question without doing anything illegal. It is defeated whatever the difficulty a person would have in so positioning herself, and however infrequently anyone would in fact do so. In taking this view the plurality ignores the very essence of Katz. The reason why there is no reasonable expec-

tation of privacy in an area that is exposed to the public is that little diminution in "the amount of privacy and freedom remaining to citizens" will result from police surveillance of of something that any passerby readily sees. To pretend, as the plurality opinion does, that same is true when the police use a helicopter to peer over high fences is, at best disingenuous. Notwithstanding the plurality's statistics about the number of helicopters registered in this country, can it seriously be questioned that Riley enjoyed virtually complete privacy in his backyard greenhouse, and that that privacy was invaded solely by police helicopter surveillance? Is the theoretical possibility that any member of the public with sufficient means) could also have hired a helicopter and looked over Riley's fence of any relevance in determining

[488 US 458]

whether Riley suffered a serious loss of privacy and personal security through the police action?

In California v Ciraolo, 476 US 207, 90 L Ed 2d 210, 106 S Ct 1809 (1986), we held that whatever might be observed from the window of an airplane flying at 1,000 feet could be deemed unprotected by any reasonable expectation of privacy. That decision was based on the belief that airplane traffic at that altitude was sufficiently common that no expectation of privacy could inure in anything on the ground observable with the naked eye so high. Indeed, we compared those airways to "public through fares," and made the obvious point that police officers were not required by the Fourth Amendment to "shield their eyes." Id., at 213, 90 L Ed 2d 210, 106 S Ct 1809. Seizing on a reference in Caraolo to the fact that the police officer was in a position "where he [h]ad a right to be," ibid., today's plurality professes to find this case indistinguishable because FAA regulation do not impose a minimum altitude requirement on helicopter traffic; thus, the officer in this case too made his observations from a vantage point where had a right to be.[1]

It is a curious notion that the reach of the Fourth Amendment

(3)

can be so largely defined by administrative regulations issued for the purpose of flight safety.[2] It is more curious still

[488 US 459]

that the plurality relies to such an extent on the legality of the officer's act, when we have consistently refused to equate police violation of the law with infringement of the Fourth Amendment.[3] But the plurality's willingness to end its inquiry when it finds that the officer was in a position he had a right to be in is misguided for an even more fundamental reason. Finding determinative the fact that the officer was where he had a right to be is, at bottom, an attempt to analogize surveillance from a helicopter to surveillance by a police standing on a public road and viewing evidence of crime through an open window or a gap in a fence. In such a situation, the occupant of the home may be said to lack any

[488 US 460]

reasonable expectation of privacy in what can be seen from that road  even if, in fact, people rarely pass that way.

\*    \*    \*    \*    \*    \*    \*    \*    \*

1.  What the plurality now states as a firm rule of Fourth Amendment jurisprudence appeared in Ciraolo, 476 US, at 213, 90 L Ed 2d 210, 106 S Ct 1809, as a passing comment: "Nor does the mere fact that an individual has taken measures to restrict some views of his activities preclude an officer's observations from a public vantage point where he has a right to be and which renders the activities clearly visible. E.G., United States v Knotts, 460 US 276, 282 [75 L Ed 2d 55, 103 S Ct 1081] (1983)." This rule for determining the constitutionality of aerial surveillance thus drives ultimately from Knotts, a case in which the police officers' feet were firmly planted on the ground. What is remarkable is not that one case builds on another, of course, but rather that a principle based on terrestrial observation was applied to airborne surveillance without any consideration whether that made a difference.

2.  The plurality's use of the FAA regulations as a means

(4)

for determining whether Riley enjoyed a reasonable expectation of privacy produces an incredible result. Fixed-wing aircraft may not be operated below 500 feet (1,000 feet over congested areas), while helicopters may be operated below those levels. See ante, at 451, n 3, 102 L Ed 2d, at 842. Therefore, whether Riley's expectation of privacy is reasonable turns on whether the police officer at 400 feet above his curtilage is seated in an airplane or a helicopter. This cannot be the law.

3. In Oliver v United States, 466 US 170, 80 L Ed 2d 214, 104 S Ct 1735 (1984), for example, we held that police officers who had trespassed upon posted and fenced private land did not violate the Fourth Amendment, despite the fact that their action was subject to criminal sanctions. We noted that the interests vindicated by the Fourth Amendment were not identical with those served by the common law of trespass. See id., at 183-184, 80 L Ed 2d 214, 104 S Ct 173 , and n 15; see also Hester v United States, 265 US 57, 68 L Ed 898, 44 S Ct 445 (1924) (trespass in "open fields" does not violate the Fourth Amendment). In Olmstead v United States, 277 US 438, 466-469, 72 L Ed 944, 48 S Ct 564, 66 ALR 376 (1928), the illegality under state law of a wiretap that yielded disputed evidence was deemed irrelevant to its admissibility. And of course Katz v United States, 389 US 347, 19 L Ed 2d 576, 88 S Ct 507 (1967), which overruled Olmstead, made plain that the question whether or not the disputed evidence had been procured by means of a trespass was irrelevant. Recently, in Dow Chemical Co. v United States, 476 US 227, 239, n 6, 90 L Ed 2d 226, 106 S Ct 1819 (1986), we declined to consider trade secret laws indicative of a reasonable expectation of privacy. Our precedent thus points not toward the position adopted by the plurality opinion, but rather toward the view on this matter expressed some years ago by the Oregon Court of Appeals: "We ... find little attraction in the idea of using FAA regulations because they were not formulated for the purpose of defining

(5)

the reasonableness of citizens' expectations of privacy. they were designed to promote air safety." State v Davis, 51 Ore App 827, 831, 627 P2d 492, 494 (1981).

---

(6)